SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
LEO D. CASERIA, Cal. Bar No. 240323
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:  213.620.1398
E mail     lcaseria@sheppardmullin.com

HELEN C. ECKERT, Cal. Bar No. 240531
JOY O. SIU, Cal. Bar No. 307610
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone:  415.434.9100
Facsimile:  415.434.3947
E-mail:    heckert@sheppardmullin.com
        jsiu@sheppardmullin.com

Attorneys for Plaintiff
CALPORTLAND COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION JUDICIAL DISTRICT

| | |
|---|---|
| CALPORTLAND COMPANY | Case No. |
|     Plaintiff, | **JURY TRIAL DEMANDED** |
|     v. | **COMPLAINT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT** |
| BNSF RAILWAY COMPANY; CSX TRANSPORTATION, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY | |
|     Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff CalPortland Company ("Plaintiff" or "CalPortland") files this Complaint under the antitrust laws of the United States against Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), Union Pacific Railroad Company ("UP") (collectively, "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1.       This is a civil antitrust action against Defendant railroads and their co-conspirators for violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff purchased rate-unregulated[1] freight from one or more of the Defendant railroads and was assessed a rail fuel surcharge by one or more of the Defendant railroads. Defendants engaged in a price-fixing conspiracy to coordinate their rail fuel surcharge programs as a mechanism for imposing supra-competitive total price increases on their shipping customers beginning no later than July 1, 2003 and continuing until at least December 31, 2008.  As a result of this unlawful conspiracy, Plaintiff seeks damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2.       Defendants conspired to use rail fuel surcharges, which were added to customers' total bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States.

3.       The total freight price for a shipping customer is called the "all-in rate." This rate consists of a base rate and a fuel surcharge applied as some percentage of the base rate.  The base rate is calculated according to fixed costs such as the cost of organizing a particular shipment, the cost to build and maintain tracks and other

---

[1] "Rate-unregulated" refers to rail freight transportation services in which the rates are set by private contracts or through other means exempt from rate regulation under federal law.

structures, and the railroad's markup of price over costs.  A rail fuel surcharge is a separately identified fee that is charged by the railroads for the agreed-upon transportation, supposedly to compensate the railroads for increases in the cost of fuel.  Defendants imposed the rail fuel surcharge as a percentage multiplier of the base rates.  These surcharges raised rates beyond the real increased costs of fuel, which allowed Defendants to collect billions of dollars of additional profits during the conspiracy at the expense of Plaintiff and other shippers.

4.      An independent study commissioned by the American Chemistry Council found that through their fuel surcharge programs, Defendants generated revenues from customers that far exceeded their actual increase in fuel costs.  From 2003 to the first quarter of 2007, the study found that railroads collected $11.66 billion in fuel surcharge revenue while costs in fuel rose by only $5.26 billion.  Defendants used their fuel surcharge programs, which were the result of an unlawful agreement, to generate revenue.

5.      For example, BNSF's annual fuel surcharge revenue increased from about $110.5 million in 2003 to about $357 million, $1.06 billion, and $1.7 billion in 2004, 2005, and 2006, respectively.  CSX increased its fuel surcharge revenue from $72 million in 2003 to about $201 million in 2004, $525 million in 2005, and $821 million in 2006.  NS and UP reaped similar financial benefits from the conspiracy.  NS increased its fuel revenue from about $65 million in 2003 to $184 million in 2004, $609 million in 2005, and then $1.14 billion in 2006.  UP increased its revenue from fuel surcharges from about $112 million in 2003 to about $330 million and $1 billion in 2004 and 2005, respectively.  This exponential increase in revenue allowed Defendants to collect billions of dollars of additional profits during the conspiracy.

6.      According to an independent study on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council, Defendants

overcharged rail shippers by over $6 billion between 2003 and the first quarter of 2007.

7.     Prior to the conspiracy, fuel surcharges were not always applied.  In order to increase revenue, Defendants devised and implemented a conspiracy to maintain certain fuel surcharges to the extent they had been applied previously, to impose certain new fuel surcharges to the extent they had not been applied previously, and to largely standardize fuel surcharges for most customers. Defendants implemented this conspiracy through unlawful agreements reached in or about the spring of 2003.

8.     Defendants' collective conspiracy has been the subject of class action litigation for several years.  *See In re Rail Freight Fuel Surcharge Antitrust Litig. (Rail Freight)*, 292 F. Supp. 3d 14 (D.D.C. 2017).  While denying class certification, the U.S. District Court for the District of Columbia ("D.C. Court"), noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury." *Id.* at 32.  That Court found that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial." *Id.* at 102.  The D.C. Court specifically found that there was "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

9.     Prior to 2003, the vast majority of rail freight transportation agreements included rate escalation provisions based on an index called the All-Inclusive Index ("AII"), which weighted a variety of cost factors, including fuel.  The AII already permitted full recovery by the railroads of actual fuel cost increases, no matter how large.  In 2003, Defendants conspired to cause the Association of American Railroads ("AAR") (a railroad trade association in which all Defendants were

members and active participants) to establish a new cost escalation index which removed fuel.  This paved the way for Defendants to apply separate and artificially high rail fuel surcharges to many customers as fuel would no longer be covered by standard rate escalation clauses.

10.     As the D.C. Court noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight*, 292 F. Supp. 3d at 104.  These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

8.     The existence of the conspiracy alleged in this Complaint is further supported by the fact that the Surface Transportation Board (which has jurisdiction over only rate-regulated traffic, traffic not at issue in this case) held in a January 25, 2007 decision that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs . . . [The railroads' fuel surcharge program was a] misleading and ultimately unreasonable practice . . . ."

9.     As a direct and proximate result of the price fixing conspiracy described in this Complaint, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff. Plaintiff paid a higher price for unregulated rail transportation services than it would have paid absent the conspiracy.

## II.     PARTIES

### A.     Plaintiff

10.     Plaintiff CalPortland Company ("CalPortland") is a corporation organized under the laws of the State of California with its principal place of business in Glendora, California.  The reference in this Complaint to CalPortland or

-4-

Plaintiff refers to CalPortland Company and each of its affiliates, subsidiary companies, predecessors, and any assignors.  This includes, but is not limited to, Glacier Northwest, Inc., Arizona Portland Cement Company, and Riverside Cement Company.  CalPortland (previously known as California Portland Cement Co.) has been producing, transporting, and selling cement, concrete and/or aggregate in the Western United States since 1891.  During the time period relevant to these allegations, CalPortland purchased unregulated rail freight transportation services from one or more of the Defendants, and during this relevant period, one or more of the Defendants assessed fuel surcharges on CalPortland in connection with that unregulated rail freight transportation service.  The prices CalPortland paid to Defendants for unregulated rail freight transportation services on which fuel surcharges were imposed were higher than they would have been absent the alleged conspiracy.  CalPortland has therefore been injured in its business and property by reason of Defendants' antitrust violations.

### B.     Defendants

11.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a major freight railroad operating primarily in the western United States.  BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  BNSF is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, BNSF:  participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

12.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida  32202.  CSX is a major freight

railroad operating primarily in the eastern United States and Canada.  CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  CSX is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, CSX:  participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

13.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad that operates primarily in the eastern part of the United States.  NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  NS is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, NS:  participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

14.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is a major freight railroad operating primarily in the western United States.  UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  UP is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, UP: participated in the conspiracy alleged in this Complaint; sold

rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

### C.   Co-Conspirators and Agents

15.    Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

16.    Plaintiff reserves the right to amend this Complaint based on discovery in this case to allege the identities of co-conspirators as they are discovered.

17.    At all times relevant to the allegations in this Complaint, other persons, firms and corporations–referred to as "co-conspirators," the identities of which are presently unknown–have willingly conspired with Defendants in their unlawful scheme as described in this Complaint.

18.    The acts alleged in this Complaint that were done by each Defendant or coconspirator were fully authorized by each of the Defendants and co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees or representatives of each Defendant or co-conspirator while actively engaged in the management, direction, or control of its affairs for that Defendant or co-conspirator.

### III.   VENUE AND JURISDICTION

19.    This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337.

21.    Venue is proper in this judicial district pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. § 1391, because during the time period relevant to these allegations, one or more of the Defendants resided, transacted business, were found,

1  or had agents in this District, and a substantial part of the events giving rise to

2  Plaintiff's claims occurred and a substantial portion of the affected interstate trade

3  and commerce described below has been carried out in this District.

4       22.    This Court has personal jurisdiction over each Defendant because,

5  among other reasons, each:  (a) transacted business in this District; (b) directly or

6  indirectly sold and delivered rail transportation services in this District; (c) has

7  substantial aggregate contacts within this District; and/or (d) engaged in an illegal

8  price-fixing conspiracy that was directed at, and had the intended effect of causing

9  injury to, persons and entities residing in, located in, or doing business in this

10  District.

11  **IV.**    **TRADE AND COMMERCE**

12       23.    During the time period relevant to Plaintiff's claims, *i.e.*, the time

13  period relevant to these allegations, Defendants accounted for over 90% of all rail

14  shipments within the United States.  The activities of Defendants and their co-

15  conspirators were within the flow of, and substantially affected interstate commerce.

16  During the relevant time period, Defendants sold and carried out rail shipments in a

17  continuous and uninterrupted flow of interstate commerce to shippers and customers

18  throughout the United States. Each Defendant and their co-conspirators used

19  instrumentalities of interstate commerce to sell and market rail freight transportation

20  services.

21       24.    The unlawful activities of Defendants have had a direct, substantial,

22  and reasonably foreseeable effect on interstate commerce.  The effect of Defendants

23  and/or their co-conspirators' anticompetitive conduct as alleged in this Complaint on

24  United States commerce gives rise to Plaintiff's claims.

25  **V.**    **INDUSTRY BACKGROUND**

26       25.    Congress deregulated the railroad industry with passage of the Staggers

27  Rail Act of 1980 ("Staggers Act").  Prior to the Staggers Act, the Interstate

28  Commerce Commission ("ICC"), heavily regulated the Railroad Industry.  Prior to

1   1980, railroads could apply to the ICC for across-the-board rate increases, which

2   could be lawfully implemented on a collective basis.

3   26.   Today, by contrast, more than 75% of all rail shipments move under

4   private transportation contracts that are not rate-regulated or that otherwise are

5   exempt from rate regulation. For this rate-unregulated traffic, the railroads cannot

6   turn to an agency to obtain across-the-board increases in freight rates and cannot

7   lawfully collude to set those rates.

8   27.   Currently, the railroad industry is highly concentrated.  The four

9   Defendants – BNSF, CSX, NS, and UP – control about 90% of all rail freight track

10  miles.

11  28.   While the purpose of deregulation of the railroad industry was to

12  promote competition and lower rates for shippers (such as the Plaintiff in this case),

13  the opposite occurred – faced with declining profits, the railroads sought to charge

14  supra-competitive prices, yielding billions in unlawful profits for themselves.

15  VI.   **THE PRE-CONSPIRACY PERIOD**

16  29.   By the early 2000s, the railroad industry had consolidated to the point

17  where further mergers were unlikely if not impossible.  In March 2000, in response

18  to a proposed merger between Defendant BNSF and Canadian National Railway

19  Co., the U.S. government's Surface Transportation Board (the successor to the

20  Interstate Commerce Commission) imposed a moratorium on new mergers.  The

21  Surface Transportation Board then promulgated more standards for merger review,

22  effectively cutting off further consolidation as an avenue for revenue growth.

23  30.   Defendants had difficulty imposing fuel surcharges prior to the

24  conspiracy, and to the extent they were able to impose them, found it difficult to

25  maintain or realize additional revenue from them.  As BNSF noted in a 2002

26  internal report, "our rail competitors do not [use fuel surcharges,] and we therefore

27  are hard pressed to achieve it."  *See Rail Freight*, 292 F. Supp. 3d. at 103.  In a

28  January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted

-9-

1  that "any increase in fuel surcharges would result in a decrease in prices of the same

2  amount in order to remain competitive." *Id.* at 104.

3       31.    BNSF's Executive Vice President/Chief Marketing Officer stated that

4  BNSF's fuel surcharge participation rates in January 2003 were "low . . . [in the] 25

5  to 30 percent range."  Opinion at 136, *In re Rail Freight Fuel Surcharge Antitrust*

6  *Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017).  CSX's Executive Vice

7  President of Sales and Marketing noted that "the fuel surcharge revenue [CSX] was

8  generating prior to the adoption of this new program in March 2003 [*i.e.* the

9  conspiratorial program]" was "[l]ow – relatively low to where it needed to be." *Id.*

10  The UP CEO also noted that fuel surcharges were rarely implemented prior to the

11  conspiracy:  "We had fuel surge [sic] programs in many contracts, but because fuel

12  had not run up, they were never implemented." *Id.* at 131.  He also noted that fuel

13  surcharges triggered "during the 2000 through 2002 time period never reached

14  significant percentage levels." *Id.* at 136.

15       32.    Since the passage of the Staggers Act, railroads had increasingly

16  entered into private freight transportation contracts with their customers that

17  included cost escalation provisions that were tied to the AII, or the Rail Cost

18  Adjustment Factor ("RCAF").  The RCAF was based on the AII.  Both indices were

19  published by the AAR, and both indices included fuel as a factor.  These indices

20  weighted a number of factors such as, for example, labor, fuel, equipment, rent and

21  interest, so that the actual impact of any particular increases to cost (such as rising

22  fuel increases) would be captured by the index.  In other words, any actual increase

23  in fuel costs, no matter how large, would be reflected in these indices and the

24  railroads would be able to recover their fuel costs.

25       33.    In 2003, BNSF, UP, CSX, and NS seized upon fuel as the means to

26  create the type of across-the-board rate increases that the railroads could no longer

27  achieve through a regulatory process.  Defendants embarked on and implemented an

28  agreed plan to remove fuel costs from the AII (and thus from the RCAF based on

-10-

1    the AII) so that Defendants could apply separate fuel surcharges.  Defendants

2    controlled and dominated the AAR and conspired to cause it to publish the All

3    Inclusive Index Less Fuel ("AIILF").  This new index no longer weighted fuel

4    against other cost factors, allowing Defendants to use the separate fuel surcharges to

5    raise total freight prices by a given percentage—and that is precisely what

6    Defendants proceeded to do.

7    **VII.   THE CONSPIRACY**

8         **A.    Defendants Entered into the Unlawful Agreement in the Spring of**

9             **2003**

10        34.    From at least the Spring of 2003 and continuing through at least 2008,

11   the top executives at each of the Defendants met regularly at restaurants,

12   recreational facilities and conference facilities under the guise of discussing the

13   railroad industry.  Upon information and belief, at these meetings, they reached an

14   unlawful agreement to impose fuel surcharges on customers.  Defendants'

15   conspiracy allowed them to maintain fuel surcharges that had been previously

16   imposed, impose new fuel surcharges where they had not been previously imposed,

17   and to standardize fuel surcharges, all of which caused customers to pay artificially

18   inflated fuel surcharges.

19        35.    For example, in March of 2003, CSX and UP were examining their fuel

20   surcharges together.  CSX internally proposed changes to its fuel surcharge

21   program.  UP's Chief Marketing Officer Jack Koraleski drafted a revised fuel

22   surcharge recommendation for UP.  Class Cert. Tr., 98, *In re Rail Freight Fuel*

23   *Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6,

24   2010 Tr.").  On March 12 and 13, 2003, UP's Koraleski attended a meeting with

25   CSX; the suggested agenda noted that Koraleski and CSX EVP of Sales and

26   Marketing Clarence Gooden had discussed "fuel surcharge methodology" prior to

27   this meeting.  *Id*. at 98-99.

28

36.     On March 20, 2003, within one week of UP's Koraleski's meeting with CSX, CSX abandoned the proposed program it had contemplated earlier in the month and instead announced a plan that matched Koraleski's recommendation for UP. *Id.* at 99. On March 31, 2003, UP adopted Koraleski's program. *Id.*

37.     In another example, during a March 18, 2003 meeting, representatives of BNSF and NS discussed "the value of synchronization across the big players in the industry." Class Cert. Tr., 349-50, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016). Not long after, at biannual meetings of the National Freight Transportation Association, executives of the Defendants met to consider and discuss developments in the railroad industry. The spring 2003 meeting of the National Freight Transportation Association ("NFTA") occurred from April 2 to 6 at the Wigwam resort in Litchfield Park, Arizona. There, BNSF and NS continued their discussion of synchronizing the industry. BNSF's and NS's Chief Marking Officers John Lanigan and Don Seale discussed fuel surcharge programs. Oct. 6, 2010 Tr. at 101. Under the cover of these biannual meetings, Defendants colluded and entered into an unlawful agreement to levy stand-alone fuel surcharges.

**B.      Pursuant to the Meetings in Early 2003, the Railroads Began to Coordinate Their Fuel Surcharges in Mid-2003**

38.     Pursuant to the conspiracy, the Western Railroads (BNSF and UP) tied their fuel surcharge to the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"), while the Eastern Railroads (CSX and NS) tied their programs to the West Texas Intermediate ("WTI") index. To the extent they had done so before, they continued to do so, but now, it was done pursuant to conspiracy and not unilateral action.

39.     As early as July 2003, the two Western Railroads (BNSF and UP) began to coordinate their fuel surcharges. In general, prior to July 2003, the UP fuel surcharge had been adjusted monthly based on the WTI Index, while the BNSF fuel

surcharge had been based on the HDF Index.  As a result of the unlawful agreement, the Western Railroads began more widely imposing fuel surcharges at the same time and in the same amount and in the same way based on the HDF Index.

40.     BNSF and UP agreed to use the HDF Index in virtually the same way. Whenever the average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded this threshold, both BNSF and UP applied a surcharge of 0.5% for every five-cent increase above the threshold.  So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2%.  In other words, the surcharge would increase 2% for every 20-cent increase in the HDF Index.

41.     Not only did BNSF and UP coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges.  As a result of the unlawful agreement, BNSF and UP decided to apply the fuel surcharges to shipments beginning the second month after the month in which there was a change in the HDF Index average price.  For example, if the HDF Index average price changed in February, BNSF and UP would announce their new fuel surcharge percentage on March 1, and then apply the surcharge to shipments in April.  Defendants published these new fuel surcharges on their websites, which made deviation from the conspiracy pricing readily detectable.

42.     The adoption of virtually identical and complex fuel surcharge programs demonstrates that these surcharge programs were the result of a conspiratorial agreement among Defendants rather than independent responses to common market issues such as increasing fuel costs.

43.     UP's decision to use the HDF Index (the same Index used by BNSF) in July 2003 is strong evidence of coordinated conduct because two months earlier, in April 2003, UP had announced changes to its trigger point but did <u>not</u> change the index it was using.  The fact that UP switched to the HDF Index in July 2003 and

COMPLAINT

began levying identical surcharges to BNSF is further evidence that UP was acting according to a conspiratorial agreement.

44.    A few months after the Western Railroads announced their coordinated surcharge programs, the two Eastern Railroads (CSX and NS) began to use the WTI Index to levy identical surcharges on their customers.  This new surcharge program was the result of the unlawful agreement that Defendants reached in the spring of 2003.

45.    CSX and NS agreed to apply identical surcharges based on the WTI Index.  Whenever the WTI Index exceeded $23 per barrel of crude oil, CSX and NS's rates were increased by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.  For example, if the price of WTI oil was $28 per barrel, the fuel surcharge would be 2%.  In other words, the fuel surcharge would be adjusted upward by 2% for every $5 increase in WTI average price.

46.    Not only did CSX and NS coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges – two calendar months after the WTI had adjusted, thereby adopting the same schedule that the Western Railroads had adopted.  For example, if the WTI Index average price exceeded $23 in February, CSX and NS would assess the applicable fuel surcharges in April.  CSX and NS published their fuel surcharges on their website, making deviation from conspiracy pricing readily apparent.

47.    This fuel surcharge program was clearly the result of a conspiratorial agreement among Defendants.  The programs were too complex and precise to be the result of unilateral action.

**C.    Defendants Removed an Obstacle to the Conspiracy**

48.    Defendants BNSF, UP, CSX, and NS agreed in 2003 to remove fuel from the AII and RCAF.  This made it easier for Defendants to apply and justify separate rail fuel surcharges as a percentage multiplier on the total base rate for the rail freight transportation, because the AII and RCAF no longer accounted for fuel.

-14-

49.     AAR board meetings and discussions took place in October and December 2003.  During these meetings, BNSF, CSX, NS and UP reached agreements and collectively caused the AAR to adopt a new cost escalation index called the AIILF.  This index was virtually identical to the AII except it removed fuel, thereby opening the door for Defendants to begin assessing separate fuel surcharges.  The underlying decision to create this new index was the result of Defendants' coordinated actions and an important step in Defendants' conspiratorial plan.

50.     There was no legitimate business justification or natural explanation for the collective action of Defendants to cause the AAR to adopt and publish the AIILF or collectively to adopt rate-based rail fuel surcharges.  Such revenue-based fuel surcharges bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure.  The fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the conspiracy period.  Defendants' motivation in collectively causing the adoption of the AIILF could not have been more accurate or more efficient fuel cost recovery. Defendants' actions were not independent responses to a common problem of increasing fuel costs.  Their motivation in causing the AAR to adopt the AIILF was so that they could more easily use fuel surcharges as profit centers to make more money.  Their own statements demonstrate that they were using the fuel surcharge programs (the details of which they agreed to) as revenue generators, not cost recovery mechanisms.  For example, an internal BNSF memorandum noted that: "Eastern Railroads [CSX and NS] have a 'profit center' with their Fuel Surcharge Programs . . . ."  Opinion at 133, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017).  Additionally, another BNSF employee described the company's fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 134.  Similarly, the

-15-

other companies recognized that the program was solely meant to generate revenue. In a form 10-K, CSX noted that its "primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." *Id.* at 133. NS employees echoed this sentiment as well: "[I]t seems like all the Merchandise rev/car increases are coming from fuel surcharges." *Id.*

51.     As a result of the concerted action among BNSF, UP, CSX, and NS, prices of rail fuel surcharges charged to rail shippers and customers like Plaintiff were raised to or maintained at supracompetitive levels during the conspiracy period.

### D.     <u>Defendants Began Imposing the New Fuel Surcharges with Few or No Exceptions</u>

52.     Defendants' conspiratorial restriction of pricing freedom is further evidenced by their policies, which mandated that fuel surcharges be included in all contracts. For example, as of January 2004, BNSF's pricing guidelines stated: "Every Contract should include a fuel surcharge clause. All new and renewing contract negotiations should have a fuel surcharge as the goal." Oct. 6, 2010 Tr. at 109. NS's Vice President acknowledged that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Rail Freight*, 292 F. Supp. 3d. at 104. A CSX employee noted that "[t]he new price vehicle should incorporate [CSX's] [fuel surcharge] program." Opinion at 133, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017). Internal UP e-mails stated that: "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Rail Freight*, 292 F. Supp. 3d. at 100.

53.     As a result of their unlawful agreement, Defendants all strictly followed the conspiracy pricing, refusing to offer any material discounts to shippers. A BNSF employee's staff meeting notes indicated that BNSF was following the

conspiracy pricing.  The employee wrote:  "[There are] [v]irtually no exceptions" to fuel surcharge adherence and "business units have done an excellent job in [fuel surcharge] adherence."  Opinion at 137, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017).  A CSX executive noted that his goal was to have "zero exceptions" when applying fuel surcharges to contracts. *Id.*  In an internal e-mail, an NS employee wrote:  "There are relatively few [NS] publications with no [fuel surcharge] . . . ."  *Id.*

54.     CSX noted in its 10-K filing for the 2005 fiscal year that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms."  BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed."  *Rail Freight*, 292 F. Supp. 3d. at 104.  This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the coconspirators easier.

55.     This no-exception policy, adopted and followed by all of the Defendants, would not make economic sense in the absence of a conspiracy.  As an internal BNSF report from 2005 recognized, the scheme only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall."  Oct. 6, 2010 Tr. at 109.

**E.     The Fuel Surcharge Percentages Charged by the Railroads Were Virtually Identical For the Entire Conspiracy and Affected Intermodal Traffic and Captive Shippers**

56.     The first chart below shows that the fuel surcharge percentages charged by the Western Railroads (BNSF and UP) varied before the conspiracy but were virtually identical starting in July 2003.  The second chart shows that the fuel surcharge percentages charged by the Eastern Railroads (CSX and NS) varied before 2004 but were virtually identical starting in March 2004.

-17-

## MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP | MONTH | BNSF | UP |
|-------|------|-----|-------|------|-----|
| Jun-02 | 1.0% | 0 | Jun-05 | 10.5% | 10.5% |
| Jul-02 | 1.0% | 0 | Jul-05 | 9.5% | 9.5% |
| Aug-02 | 0 | 0 | Aug-05 | 10.5% | 10.5% |
| Sep-02 | 0 | 0 | Sep-05 | 11.5% | 11.5% |
| Oct-02 | 1.0% | 0 | Oct-05 | 13.0% | 13.0% |
| Nov-02 | 2.0% | 0 | Nov-05 | 16.0% | 16.0% |
| Dec-02 | 2.5% | 0 | Dec-05 | 18.5% | 18.5% |
| Jan-03 | 2.0% | 2.0% | Jan-06 | 13.5% | 13.5% |
| Feb-03 | 2.0% | 2.0% | Feb-06 | 12.0% | 12.0% |
| Mar-03 | 2.5% | 2.0% | Mar-06 | 12.5% | 12.5% |
| Apr-03 | 4.5% | 2.0% | Apr-06 | 12.5% | 12.5% |
| May-03 | 2.0% | 2.0% | May-06 | 13.5% | 13.5% |
| Jun-03 | 3.0% | 2.0% | Jun-06 | 15.0% | 15.0% |
| Jul-03 | 2.5% | 2.5% | Jul-06 | 16.5% | 16.5% |
| Aug-03 | 2.0% | 2.0% | Aug-06 | 16.5% | 16.5% |
| Sep-03 | 2.0% | 2.0% | Sep-06 | 17.0% | 17.0% |
| Oct-03 | 2.5% | 2.5% | Oct-06 | 18.0% | 18.0% |
| Nov-03 | 2.5% | 2.5% | Nov-06 | 15.5% | 15.5% |
| Dec-03 | 2.5% | 2.5% | Dec-06 | 13.0% | 13.0% |
| Jan-04 | 2.5% | 2.5% | Jan-07 | 13.0% | 13.0% |
| Feb-04 | 2.5% | 2.5% | Feb-07 | 14.0% | 14.0% |
| Mar-04 | 3.5% | 3.5% | Mar-07 | 12.5% | 12.5% |
| Apr-04 | 3.5% | 3.5% | Apr-07 | 12.5% | 12.5% |
| May-04 | 4.0% | 4.0% | May-07 | 14.5% | 14.5% |
| Jun-04 | 4.5% | 4.5% | Jun-07 | 16.0% | 16.0% |
| Jul-04 | 5.0% | 5.0% | Jul-07 | 15.5% | 15.5% |
| Aug-04 | 5.0% | 5.0% | Aug-07 | 16.0% | 16.0% |
| Sep-04 | 5.0% | 5.0% | Sep-07 | 16.5% | 16.5% |
| Oct-04 | 6.0% | 6.0% | Oct-07 | 16.5% | 16.5% |
| Nov-04 | 7.0% | 7.0% | Nov-07 | 17.5% | 17.5% |
| Dec-04 | 9.0% | 9.0% | Dec-07 | 18.5% | 18.5% |
| Jan-05 | 9.0% | 9.0% | Jan-08 | 21.5% | 21.5% |
| Feb-05 | 8.0% | 8.0% | Feb-08 | 21.0% | 21.0% |
| Mar-05 | 7.5% | 7.5% | Mar-08 | 21.0% | 21.0% |
| Apr-05 | 8.0% | 8.0% | Apr-08 | 21.5% | 21.5% |
| May-05 | 10.0% | 10.0% | May-08 | 26.5% | 26.5% |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SMRH:4838-8494-2773

COMPLAINT

MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

57.     The foregoing uniform pricing for more than four years is not explained by any legitimate business justification, nor was it a common response to the problem of rising fuel costs.  As alleged in this Complaint, any actual fuel cost increases experienced by Defendants would have been covered by the AII.

58.     Railroad industry analysts took note of the curious "convergence" in rail fuel surcharge methodologies adopted by the Defendants.  One analyst concluded that Defendants' rail fuel surcharges were "not supported" by fuel cost increases.  The analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," and noted that "the way to gain significant market share is to lead the

1   competition rather than following the competition." John Gallagher, *Following the*
2   *Competition*, TRAFFIC WORLD (July 14, 2003).

3   **VIII.   THE SURFACE TRANSPORTATION BOARD DECISION AND THE**
4   **HISTORY OF PRIOR CASES**

5   59.   As previously alleged, shippers of both rate-regulated and rate-
6   unregulated traffic were affected by the artificially high fuel surcharges imposed by
7   Defendants' conspiracy.  Shippers of rate-regulated traffic complained to the
8   Surface Transportation Board in 2006.  Shippers of rate-unregulated traffic had
9   similar complaints.

10   60.   In 2006, shippers of rate-unregulated traffic complained that the fuel
11   surcharges imposed on them were unreasonable.  The STB instituted a proceeding to
12   inquire into these fuel surcharge practices.  The STB proceeding and ultimate
13   decision related only to rate-regulated traffic, not rate-unregulated traffic that is the
14   subject of this Complaint.  However, as the fuel surcharges applied to rate-regulated
15   traffic are the same fuel surcharges applied to rate-unregulated traffic, the STB
16   decision further indicates that Defendants entered into an agreement to restrain trade
17   in violation of the antitrust laws.

18   61.   The STB held proceedings in mid-2006 and released an opinion in
19   January 2007, concluding:  "[I]t is an unreasonable practice to compute fuel
20   surcharges as a percentage of the base rates.  Because railroads rely on differential
21   pricing, under which rates are dependent on factors other than costs, a surcharge that
22   is tied to the level of the base rate, rather than to fuel consumption for the movement
23   to which the surcharge is applied, cannot fairly be described as a cost recovery
24   mechanism.  Rather, a fuel surcharge program that increases all rates by a set
25   percentage stands virtually no prospect of reflecting the actual increase in fuel costs
26   for handling the particular traffic to which the surcharge is applied.  Two shippers
27   may have traffic with identical fuel costs, but if one starts out with a higher base rate
28   (because for example it has fewer transportation alternatives) it will pay

-20-

dramatically more in fuel surcharges." *Rail Fuel Surcharges*, Ex. Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 26, 2007).  Further, the Court noted that "imposing rate increases in this manner, when there [was] no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge [was] applied, is a misleading and ultimately unreasonable practice." *Id.* at *4.

62.    While the STB did not prohibit the use of fuel surcharges, it cautioned the railroads that any surcharge imposed must have "a reasonable nexus to fuel consumption." *Id* at *6.

63.    Pursuant to their conspiracy, Defendants applied the same misleading and unreasonable fuel surcharge practices described above to private rail-freight transportation contracts, thus injuring Plaintiff in this case and causing it to pay supra-competitive prices for rail transportation services.

## IX.    DEFENDANTS' CONSPIRACY WAS HIGHLY EFFECTIVE

64.    As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supra-competitive prices for rail transportation services.

65.    As alleged above, Defendants reaped huge profits from the unlawful fuel surcharges.

66.    As a result of the unlawful conduct, combination, or conspiracy alleged in this Complaint:  (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, maintained, increased, or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

X.    **DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY**

67.    Discovery is necessary to determine the full scope of the conspiracy, including the time frame and participants.  Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, or other allegations based upon discovery and further investigation.

## COUNT I

**Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act**
**(Against All Defendants)**

68.    Plaintiff incorporates by reference each of the paragraphs alleged above.

69.    Beginning in or about 2003 and continuing in force or effect, or both, through at least 2008, with an effect that continued thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of unregulated rail freight transportations services in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.    This contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, increased and/or standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  This contract, combination or conspiracy constitutes a *per se* violation of trade and is, in any event, an unlawful restraint of trade.

71.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.  As alleged above, Defendants' unlawful conduct was carried out through mutual understandings and agreements.

-22-

72.     This contract, combination or conspiracy in restraint of trade has had the following effects:  (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, increased, maintained and/or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

73.     Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet ascertained.  Plaintiff's injury as a purchaser of the unregulated rail freight is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.      That Defendants' unlawful contract, combination, or conspiracy be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B.      Compensatory damages as provided by law and a judgment against Defendants on behalf of Plaintiff;

C.      An order permanently enjoining Defendants from continuing or maintaining their unlawful combination, conspiracy, or agreement;

D.      Treble damages as provided by law;

E.      Plaintiff's attorneys' fees and costs, as provided by law, and;

F.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

SMRH:4838-8494-2773                                                                        COMPLAINT

1    Dated:  April 21, 2020                Respectfully submitted,

2

3

4                                         By        */s/ Leo D. Caseria*
                                                    LEO D. CASERIA
5

6                                         Leo D. Caseria (SBN 240323)
                                          lcaseria@sheppardmullin.com
7                                         **SHEPPARD, MULLIN, RICHTER &**
                                          **HAMPTON LLP**
8                                         333 South Hope Street, 43rd Floor
9                                         Los Angeles, California 90071-1422
                                          Telephone:  213-620-1780
10                                        Facsimile:   213-620-1398

11

12                                        Helen C. Eckert (SBN 240531)
                                          heckert@sheppardmullin.com
13                                        Joy O. Siu (SBN 307610)
                                          jsiu@sheppardmullin.com
14                                        **SHEPPARD, MULLIN, RICHTER &**
                                          **HAMPTON LLP**
15                                        Four Embarcadero Center, 17th Floor
16                                        San Francisco, CA 94111
                                          Telephone:  415-434-9100
17                                        Facsimile:   415-434-3947

18

19                                        Attorneys for plaintiff
                                          CALPORTLAND COMPANY
20

21

22

23

24

25

26

27

28

SMRH:4838-8494-2773                                                    COMPLAINT